UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------X

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: __ 01/25/2021
```

LUCILLE TIRADO, as the Administratrix of the
Estate of EUGENE CASTELLE, deceased,

                                              Plaintiff,                 19-CV-10377 (LAK)(SN)

                    -against-                                            REPORT &
                                                                        RECOMMENDATION
CITY OF NEW YORK, et al.,

                                              Defendants.

------------------------------------------------------------------X

SARAH NETBURN, United States Magistrate Judge.

TO THE HONORABLE LEWIS A. KAPLAN:

        Lucille Tirado (hereinafter "Plaintiff"), as the administratrix of her son's estate, brings

this suit pursuant to 42 U.S.C. § 1983 against the City of New York (the "City") and multiple

correction officers and medical staff at the Anna M. Kross Center on Rikers Island ("AMKC")

(collectively, "Defendants"). Plaintiff alleges Defendants demonstrated deliberate indifference to

the serious medical needs of her son Eugene Castelle ("Castelle") while he was incarcerated at

the AMKC in November 2016, where he ultimately died. The City and 11 of the individual

Defendants move to dismiss the Amended Complaint pursuant to Rule 12(b)(6) of the Federal

Rules of Civil Procedure for failure to state a claim upon which relief can be granted.[1] ECF No.

50.

---

[1] Defendants Correction Officer ("C.O.") Rogers and C.O. Garamede have not yet been identified and
therefore have not appeared in this action. Accordingly, the motion to dismiss at ECF No. 50 is deemed to
be interposed on behalf of all the individual defendants except for C.O. Rogers and C.O. Garamede. That
being said, were they to appear, the Court assumes their claims would be considered in the same fashion
as those of the other officers, exclusive of C.O. DaCruz.

I recommend that the Court GRANT in part and DENY in part Defendants' motion to dismiss the Amended Complaint.

## BACKGROUND

The Court accepts as true all factual allegations in the amended complaint and draws all reasonable inferences in Plaintiff's favor. Bryant v. N.Y. State Educ. Dep't, 692 F.3d 202, 210 (2d Cir. 2012) (quoting Chambers v. Time Warner, Inc., 282 F.3d 147, 152 (2d Cir. 2002)).

## I.   Factual Background

On November 8, 2016, Castelle died in the custody of the New York City Department of Correction ("DOC") while detained pretrial at the AMKC on Rikers Island. ECF No. 47 ("Am. Compl.") at ¶ 26. Castelle, who had just turned 27 years old, had entered Rikers Island on approximately November 2, 2016, after spending several weeks in a Florida jail. Id. at ¶¶ 29, 30. Castelle was housed at the AMKC, which is the facility on Rikers Island for new pretrial detainees with drug detoxification needs and who may therefore be more susceptible to medical emergencies and require more medical attention. Id. at ¶¶ 26–28. Although it is not explicitly stated in the Amended Complaint, it is implied that Castelle was undergoing drug detoxification, as the Amended Complaint notes he would have experienced "significant withdrawal symptoms" before arriving at Rikers Island.[2] Id. at ¶ 29.

Upon his arrival at Rikers Island, Castelle went through the comprehensive medical screening that is required upon an individual's arrival at the detention complex. Id. at ¶ 30; see 40 R.C.N.Y. § 3-04 (requiring "[s]creening for health purposes . . . on all inmates upon their

---

[2] The Amended Complaint further alleges that Florida, where Castelle had previously been incarcerated, does not supply methadone to pre-trial detainees. Am. Compl. at ¶ 29. Methadone is an opiate agonist commonly used to treat drug addiction. See Methadone, Substance Abuse & Mental Health Services Admin., https://www.samhsa.gov/medication-assisted-treatment/medications-counseling-related-conditions/methadone (last updated Sept. 8, 2020).

arrival at the initial receiving correctional facility"). Plaintiff asserts that Castelle was prescribed an electrocardiogram ("EKG") as a part of the initial screening, but he allegedly refused it, although he permitted other tests to be conducted. Id. at ¶ 31. Plaintiff asserts that the EKG would have identified Castelle's pre-existing heart condition, which caused a decrease in blood flow to his heart. Id. at ¶ 32.

Physician Assistant ("P.A.") Alexis Quentz prescribed Castelle two medications on intake: Librium and methadone. Id. at ¶ 33. There is a risk of death when the two drugs are taken together; the Librium label warns that "concomitant use with opioids" like methadone "may result in profound sedation, respiratory depression, coma, and death." Id. at ¶ 34; see also ECF No. 73, Ex. 1 (Librium Warning Label). Due to this danger, the label also states: "Reserve concomitant prescribing of these drugs for use in patients for whom alternative treatment options are inadequate. Limit dosages and durations to the minimum required. Follow patients for signs and symptoms of respiratory depression and sedation." Id. at ¶ 34; see also ECF No. 73, Ex. 1. Plaintiff asserts the risk of death associated with concomitant use of Librium and methadone is exacerbated when combined with Castelle's underlying heart condition. Id. at ¶ 33. P.A. Quentz, who had been licensed since 2011, did not consult with a medical doctor before prescribing the medications, did not order regular monitoring for adverse reactions, and did not issue any warning to other DOC staff about the potential risks and side effects associated with the combination of medications Castelle was prescribed. Id. at ¶¶ 37–40.

Castelle received doses of both Librium and methadone for five consecutive days, from November 3 through November 7, 2016. Id. at ¶ 41. Castelle took his last dose of Librium at 8:58 p.m. on November 7, 2016, and shortly thereafter he began to experience chest pains and

difficulty breathing, the "symptoms of the medical condition [from] which he would eventually die." Id. at ¶¶ 41–42.

Castelle requested medical attention at least once on November 7, 2016. Id. at ¶ 43. That day, Mr. Castelle requested assistance from the correction officer on duty in Dorm 4 of the AMKC. Id. at ¶ 43. The Amended Complaint does not describe the nature of Castelle's request. Later, in the early morning of November 8, 2016, Castelle again sought medical attention with the help of another incarcerated individual who assisted Castelle to the "Bubble," the correction officers' duty station. Id. at ¶ 45. C.O. Anais DaCruz was on duty at the time, working the third of three consecutive eight-hour shifts. Id. at ¶¶ 45–46. Although Castelle "needed assistance walking and exhibited symptoms of serious illness," C.O. DaCruz denied his request for medical assistance, cursed at him, and ordered him back to his bed. Id. at ¶¶ 47, 49. Castelle complied and returned to his bunk. Id. at ¶ 51. Later that same day, the officer who took over C.O. DaCruz's post at 8:00 a.m. discovered that Castelle had died in his sleep. Id. at ¶ 54.

## II. Procedural History

Plaintiff initiated this action on November 7, 2019.[3] See ECF No. 1. In the original Complaint, Plaintiff named and identified Correction Officers DaCruz, Ward, Brown, Sistrunck, Nugent, Daniels, and Azeez, and Captains Batchelor, Price, and Ellis as defendants; Correction Officers Rogers and Garamede were named, but not identified with badge numbers as were the others. Id. at ¶¶ 9–21. Plaintiff also named a Dr. John Doe #1 as a defendant and identified them as someone who was "involved in [Castelle's] medical treatment." Id. at ¶ 22. Plaintiff

---

[3] Ms. Tirado, acting as administratrix of her son's estate, had previously sued the City and the DOC for medical malpractice in New York State Supreme Court. See ECF No. 69 at ¶ 6 ; ECF No. 69, Ex. 4 (New York State Supreme Court Verified Bill of Particulars). The negligence claims were dismissed on January 22, 2020. ECF No. 69 at ¶ 19.

subsequently filed an Amended Complaint on March 9, 2020, naming for the first time defendant P.A. Quentz.[4] ECF No. 47.

On May 8, 2020, the City moved to dismiss the Amended Complaint pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. ECF No. 50. Although service had not yet been completed on the individual defendants at the time the motion was filed, the motion contemplated the inclusion of the individual defendants once they appeared. ECF No. 52 at 1 n.1. The Court subsequently granted Defendants' request to extend the motion to dismiss as to Correction Officers Ward, Sistrunck, Nugent, Daniels, and Azeez, Captains Batchelor, Prince, and Ellis, and P.A. Quentz on October 23, 2020, ECF No. 82; as to Defendant C.O. Brown on November 4, 2020, ECF No. 86; and as to Defendant C.O. DaCruz on November 17, 2020, ECF No. 90. As of today's date, Correction Officers Rogers and Garamede have yet to be identified and have not appeared in this action. Accordingly, the motion to dismiss has not been deemed interposed on their behalf.

## DISCUSSION

### I. Legal Standard Governing Motions to Dismiss

Federal Rule of Civil Procedure 12(b)(6) requires dismissal of an action if it "fail[s] to state a claim upon which relief can be granted." "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)). A claim is plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct

---

[4] As discussed in more detail below, the Court assumes Plaintiff intended to name P.A. Quentz in place of "Dr. John Doe #1," but the Amended Complaint appears to contain accidental references to "Dr. John Doe #1," despite naming P.A. Quentz. See Am. Compl. at ¶ 22.

alleged." Id. (citing Twombly, 550 U.S. at 556). While a plaintiff need not provide "detailed factual allegations" in their complaint, they must assert "more than labels and conclusions, and a formulaic recitation of a cause of action's elements" in order to survive a Rule 12(b)(6) motion to dismiss. Twombly, 550 U.S. at 555. When applying this standard, a court takes all factual allegations in the complaint to be true and draws all reasonable inferences in the plaintiff's favor. See Harris v. Mills, 572 F.3d 66, 71 (2d Cir. 2009) (citation omitted).

## II.  Claims Against the Individual Defendants Under Section 1983

Plaintiff brings section 1983 claims of deliberate indifference against each of the individual defendants. The Court addresses Plaintiff's section 1983 claims by dividing the individual defendants into four groups: (1) Correction Officers Ward, Brown, Sistrunck, Nugent, Daniels, and Azeez; (2) Captains Batchelor, Prince, and Ellis; (3) C.O. DaCruz; and (4) P.A. Quentz. Am. Compl. at ¶¶ 57, 59.

### A.  Legal Standards

Section 1983 provides a right of action to individuals whose federally-protected rights have been deprived by persons acting under color of state law. 42 U.S.C. § 1983. In order to state a claim under section 1983, "a plaintiff must allege the violation of a right secured by the Constitution and the laws of the United States, and must show that the alleged deprivation was committed by a person acting under color of state law." West v. Atkins, 487 U.S. 42, 48 (1988) (citations omitted).

New York law provides that "[f]or any injury an action may be brought or continued by the personal representative of the decedent." N.Y. Est., Powers & Trusts Law § 11–3.2(b). Accordingly, Castelle's section 1983 claim survives his death. See Harrison v. Harlem Hospital, No. 05-cv-08271 (WHP), 2007 WL 2822231, at *2 (S.D.N.Y. Sept. 28, 2007); Duchesne v.

Sugarman, 459 F. Supp. 313, 315 (S.D.N.Y. 1978). Ms. Tirado, as administratrix of Castelle's

estate, is Castelle's personal representative and qualified to bring this action. See Vasconcellos v.

City of New York, No. 12-cv-08445 (CM), 2014 WL 4961441, at *3–4 (S.D.N.Y. Oct. 2, 2014).

A pretrial detainee may bring claims alleging "unconstitutional conditions of

confinement" under section 1983, which are "governed by the Due Process Clause of the

Fourteenth Amendment." Darnell v. Pineiro, 849 F.3d 17, 29 (2d Cir. 2017). In order to establish

such a claim, a plaintiff must demonstrate that (1) "the challenged conditions were sufficiently

serious to constitute objective deprivations of the right to due process," and (2) the individual

defendant "acted with at least deliberate indifference to the challenged conditions." Id.; accord

Santi v. City of New York, No. 17-cv-04129 (GBD)(SN), 2018 WL 3084064, at *2 (S.D.N.Y.

June 22, 2018).

To allege a constitutional claim for deliberate indifference to serious medical needs, a

plaintiff must satisfy both (1) objective and (2) subjective, or "*mens rea*," prongs. Darnell, 849

F.3d at 29; see Salahuddin v. Goord, 467 F.3d 263, 279–80 (2d Cir. 2006); Smith v. Outlaw, No.

15-cv-09961 (RA), 2017 WL 4417699, at *2 (S.D.N.Y. Sept. 30, 2017).

The objective prong is satisfied if the plaintiff establishes that he was "actually deprived

of adequate medical care" and that the inadequate medical care was "sufficiently serious."

Salahuddin, 467 F.3d at 279–80. A sufficiently serious deprivation is one where "a condition of

urgency, one that may produce death, degeneration, or extreme pain exists." Hathaway v.

Coughlin, 99 F.3d 550, 553 (2d Cir. 1996) (quoting Hathaway v. Coughlin, 37 F.3d 63, 66 (2d

Cir. 1994) (internal quotation marks omitted)). A plaintiff "must show that the conditions, either

alone or in combination, pose an unreasonable risk of serious damage to his health." Walker v.

Schult, 717 F.3d 119, 125 (2d Cir. 2013) (citing Rhodes v. Chapman, 452 U.S. 337, 347 (1981)).

"There is no settled, precise metric to guide a court in its estimation of the seriousness of a prisoner's medical condition." Brock v. Wright, 315 F.3d 158, 162 (2d Cir. 2003). Therefore, a court's inquiry "must be tailored to the specific circumstances of each case." Outlaw, 2017 WL 4417699, at *2 (quoting Smith v. Carpenter, 316 F.3d 178, 185 (2d Cir. 2003)).

Under the subjective prong, a pretrial detainee must establish that the defendant "acted intentionally to impose the alleged condition, or recklessly failed to act with reasonable care to mitigate the risk that the condition posed to the pretrial detainee even though the defendant-official knew, or should have known, that the condition posed an excessive risk to health or safety." Darnell, 849 F.3d at 35. "Deliberate indifference" in the pretrial context is "'defined objectively,' and the 'Due Process Clause can be violated when an official does not have subjective awareness that the official's acts (or omissions) have subjected the pretrial detainee to a substantial risk of harm.'" Lloyd v. City of New York, 246 F. Supp. 3d 704, 718 (S.D.N.Y. 2017) (quoting Darnell, 849 F.3d at 35); see House v. City of New York, No. 18-cv-06693 (PAE)(KNF), 2020 WL 6891830, at *14 (S.D.N.Y. Nov. 24, 2020) (explaining that although the second prong is referred to as the "subjective prong," "in the context of a pretrial detainee's challenge under the Due Process Clause of the Fourteenth Amendment, the *mens rea* prong . . . is objective in nature" (citation omitted)). Nevertheless, a plaintiff must show more than "an inadvertent failure to provide adequate medical care." Smith, 316 F.3d at 184.

A section 1983 claim must allege the personal involvement of each individual defendant in the professed constitutional deprivation. See Costello v. City of Burlington, 632 F.3d 41, 48–49 (2d Cir. 2011); Farid v. Ellen, 593 F.3d 233, 249 (2d Cir. 2010). Indeed, a plaintiff must show the "personal participation by one who has knowledge of the facts that rendered the conduct

illegal." <u>Provost v. City of Newburgh</u>, 262 F.3d 146, 155 (2d Cir. 2001); <u>accord</u> <u>House</u>, 2020 WL 6891830, at *10.

## B. Claims Against Correction Officers and Captains

Plaintiff asserts a claim of deliberate indifference against Correction Officers DaCruz, Ward, Brown, Sistrunck, Nugent, Daniels, and Azeez, and Captains Batchelor, Prince, and Ellis based on their failure to provide medical care to Castelle. Am. Compl. at ¶ 57.

### 1. Serious Deprivation of Medical Care

Plaintiff asserts that Castelle's death constitutes the "worst possible deprivation," and that Castelle was never provided any treatment for chest pains and difficulty breathing, the symptoms that preceded his death. Am. Compl. at ¶ 42; ECF No. 68 (Pl.'s Opp.) at 5. Plaintiff claims Castelle's attempts to seek medical assistance were rejected twice, once on November 7, 2016, and a second time in the "early morning hours of November 8, 2016." Am. Compl. at ¶¶ 43, 45. A Court must consider "how the offending conduct is inadequate and what harm, if any the inadequacy has caused . . . the prisoner." <u>Salahuddin</u>, 467 F.3d at 280 (citing <u>Helling v. McKinney</u>, 509 U.S. 25, 32–33 (1993)). Although the Amended Complaint notes that Castelle began to experience chest pains and difficulty breathing on November 7, 2016, it is unclear whether he relayed that information to the correction staff when he requested medical assistance on November 7, 2016. Am. Compl. at ¶¶ 43–44. It is similarly unclear what information was relayed to C.O. DaCruz when Castelle, with the assistance of another individual, again sought medical attention on November 8, 2016. <u>Id.</u> at ¶¶ 45, 47. The second time he requested assistance, however, Castelle is alleged to have "needed assistance walking" and was exhibiting "symptoms of serious illness," though it is not stated what those symptoms were. <u>Id.</u> at ¶ 47. The Court draws the reasonable inference that on both occasions during which he sought assistance,

Castelle presented with symptoms that suggested a serious medical condition. See Smith, 2017 WL 4417699, at *4.

"Particularly in light of the obligation to construe Plaintiff's pleadings liberally," the Court concludes that Castelle received inadequate medical care, and an incarcerated individual who presents with Castelle's symptoms, was denied all treatment while experiencing those symptoms, and subsequently dies has sufficiently demonstrated that "the conditions . . . pose[d] an unreasonable risk of serious damages to his health." Smith, 2017 WL 4417699, at *4 (quoting Walker, 717 F.3d at 125) (finding a plaintiff who asserted a heart attack and chest pains to have sufficiently asserted a serious deprivation of medical care); Mandala v. Coughlin, 920 F. Supp. 342, 353 (E.D.N.Y. 1996) (noting that "ignoring a prisoner's complaints of chest pains where the prisoner later died of a heart attack" constituted a "serious medical need[]"); contra Hutchinson v. N.Y. State Corr. Officers, No. 02-cv-02407 (CBM), 2003 WL 22056997, at *5 (S.D.N.Y. Sept. 4, 2003) (finding that chest pains did not "constitute a sufficiently serious condition").

## 2. Mental Element of Deliberate Indifference

Because Plaintiff is deemed to have sufficiently alleged a serious deprivation of medical care, the Court proceeds to the "*mens rea*" prong of the analysis and considers whether the individual defendants were deliberately indifferent to Castelle's needs by denying him medical attention. The Court finds that Plaintiff's Amended Complaint does not establish that Correction Officers Ward, Brown, Sistrunck, Daniels, Nugent, and Azeez "recklessly failed to act with reasonable care." Darnell, 849 F.3d at 35. The Court similarly finds that the Amended Complaint does not establish objective recklessness with respect to Captains Batchelor, Prince, and Ellis. The Court does conclude, however, that Plaintiff has sufficiently established the second prong as to Correction Officer DaCruz.

      a.  **Correction Officers Ward, Brown, Sistrunck, Daniels, Nugent, and Azeez**

Plaintiff has not adequately pleaded the objective recklessness element with respect to Correction Officers Ward, Brown, Sistrunck, Daniels, Nugent, and Azeez. The Amended Complaint briefly asserts that C.O. Ward was "on post" on November 7, 2016, when Castelle sought medical attention for the first time. Am. Compl. at ¶ 44. Otherwise, the Amended Complaint contains no information about each correction officer's "personal involvement in the alleged constitutional deprivation." Grullon v. City of New Haven, 720 F.3d 133, 138 (2d Cir. 2013). The Amended Complaint fails to indicate when, let alone how, each of the other correction officers would have come into contact with Castelle and in what manner they denied him medical care. The Amended Complaint merely states that each correction officer "worked at the Anna M. Kross Center on Rikers Island at the time of the incidents alleged herein, and perpetrated and/or supervised the failure to take plaintiff to see a medical professional." Am. Compl. at ¶¶ 10–15.

The Amended Complaint fails to establish that Correction Officers Ward, Brown, Sistrunck, Daniels, Nugent, and Azeez knew or should have known that there was a heightened risk to Castelle's safety. Although the Court accepts as true that Castelle requested medical attention on November 7 and 8, 2016, the Amended Complaint critically fails to establish that Mr. Castelle sought medical attention from these individuals. The Amended Complaint asserts that C.O. Ward was "on post in Dorm 4 of AMKC" when Castelle sought medical attention, yet it does not allege that C.O. Ward was the one to whom Castelle made his request. Am. Compl. at ¶ 44. The Court cannot determine, based on the facts in the Amended Complaint, whether these officers acted "intentionally to impose the alleged condition, or recklessly failed to act." Darnell, 849 F.3d at 35.

Plaintiff suggests that the Correction Officers "knew, or should have known" that Castelle had been prescribed medications that could cause oversedation and respiratory distress. ECF No. 68 at 7. That argument is unavailing. Plaintiff relies on Fleming v. City of New York, in which the court found that the correction officers "knew, or should have known" that the plaintiff was diagnosed with cancer and Hepatitis B and that "placing him in solitary confinement without access to medical treatment for 30 days" would be a "serious risk to his health." No. 18-cv-04866 (GBD), 2019 WL 4392522, at *11 (S.D.N.Y. Aug. 27, 2019), reconsideration denied, 2020 WL 2133162 (S.D.N.Y. May 5, 2020). But in Fleming, the plaintiff had been diagnosed with cancer months earlier and undergone multiple rounds of chemotherapy before the alleged deprivation. Id. Such an extended timeline is at odds with the facts in this case. Here, Plaintiff has not alleged the officers' "personal involvement in or awareness of" the health issues with which Castelle presented. Grullon, 720 F.3d at 139.

The Court recognizes that the Rules of the City of New York require that "[c]orrectional personnel who know or have reason to believe that an inmate is in need of emergency health services shall make the appropriate notifications." 40 R.C.N.Y. § 3-02(d)(2). Yet the Amended Complaint has not alleged any facts showing that any of the officers, aside from C.O. DaCruz, knew or had reason to believe Castelle needed medical assistance.

Accordingly, the Court finds that Plaintiff has failed to state a claim of deliberate indifference by Correction Officers Ward, Brown, Sistrunck, Daniels, Nugent, and Azeez.

### b.  Captains Batchelor, Prince, and Ellis

Similarly, Plaintiff has not adequately pleaded the recklessness element as to Captains Batchelor, Prince, and Ellis (the "Captains"). The Amended Complaint asserts that Captain Batchelor was on duty with C.O. Ward when Castelle sought medical assistance on November 7,

2016, but does not provide any information as to Captains Prince or Ellis. Am. Compl. at ¶ 44. For the same reasons Plaintiff's claims as to Correction Officers Ward, Brown, Sistrunck, Daniels, Nugent, and Azeez must fail, so too must the claims against the Captains in their individual capacity.

Plaintiff can also be considered to allege claims against the Captains in their supervisory capacity. Id. at ¶¶ 19–21. As the Court of Appeals recently held, "there is no special rule for supervisory liability," and a complaint must instead "plead and prove 'that each Government-official defendant, through the official's own actions, has violated the Constitution.'" Tangreti v. Bachmann, 983 F.3d 609, 616 (2d Cir. 2020) (quoting Iqbal, 556 U.S. at 676). Because Plaintiff does not show how the Captains individually violated Castelle's rights, I recommend the Court grant Defendants' motion to dismiss Captains Batchelor, Prince, and Ellis.

### c. Correction Officer Anais DaCruz

Plaintiff has, however, sufficiently pleaded objective recklessness as to C.O. DaCruz. Plaintiff asserts that C.O. DaCruz was on duty when Castelle sought medical assistance for the second time, on the morning of November 8, 2016. Am. Compl. at ¶ 45. C.O. DaCruz allegedly observed that Castelle required the assistance of a fellow detainee to walk and was "exhibit[ing] symptoms of serious illness," and then denied Castelle's "request for medical attention, cursed at him, and ordered him back to his bed." Id. at ¶ 47. Although Plaintiff does not assert what information about Castelle's condition was relayed to C.O. DaCruz when Castelle asked him for medical attention, C.O. DaCruz would have observed Castelle's difficulty walking and other symptoms, and he did not attempt to secure any medical treatment for Castelle. Id. Given these circumstances, C.O. DaCruz should have, at a minimum, "taken *some* action instead of merely"

sending Castelle back to his bed, where he died hours later. <u>Smith</u>, 2017 WL 4417699, at *5 (emphasis in original).

As opposed to the other correction officers, Plaintiff has pleaded facts that indicate that C.O. DaCruz "personally" refused Castelle treatment. <u>Cf.</u> <u>Feliz v. City of New York</u>, No. 18-cv-05023 (PAE)(SN), 2019 WL 6831552, at *7–8 (S.D.N.Y. Aug. 5, 2019), <u>report and recommendation adopted</u>, 2019 WL 4386017 (S.D.N.Y. Sept. 13, 2019). C.O. DaCruz's refusal of Castelle's request for medical assistance, in light of Castelle's alleged condition at the time of his request, plausibly establishes that C.O. DaCruz "should have known of the obvious risk to" Castelle's health, "even if he was not subjectively aware of it." <u>Smith</u>, 2017 WL 4417699, at *5 (citing <u>Darnell</u>, 849 F. 3d at 35). Accordingly, I recommend the motion to dismiss be denied as to Defendant C.O. DaCruz.

### C.  Claims Against Medical Staff

Plaintiff separately alleges that P.A. Quentz was deliberately indifferent to the explicit warnings on the Librium label and in the medical literature when he prescribed Castelle Librium and methadone and then failed to obtain an EKG, consult a medical doctor, or order monitoring. Am. Compl. at ¶ 59. I find the Amended Complaint to plausibly allege that P.A. Quentz was deliberately indifferent to Castelle's serious medical needs.

### 1.  Serious Deprivation of Medical Care

Under the first, objective prong, the alleged deprivation must be "sufficiently serious," and create a condition "that may produce death, degeneration, or extreme pain." <u>Hathaway</u>, 99 F.3d at 553 (quotation and internal quotation marks omitted). Plaintiff asserts that Castelle was prescribed an EKG, but that it was never performed and that P.A. Quentz nevertheless prescribed

Castelle Librum and methadone. Am. Compl. at ¶¶ 31–33. Plaintiff contends the deprivation was sufficiently serious as it resulted in Castelle's death. Pl.'s Opp. at 5.

There is no question that the inadequacy caused significant harm—death—and so the question lies in "how the offending conduct is inadequate." Salahuddin, 467 F.3d at 80 (citing Helling, 509 U.S. at 32–33). Failure to perform an EKG may amount to medical negligence, but the Court finds it is insufficient to support a constitutional claim of deprivation of medical care. See Butler v. Furco, 614 F. App'x 21, 23 (2d Cir. 2015) (noting that a nurse's failure to administer an EKG would not be an actionable constitutional claim).

P.A. Quentz also prescribed Castelle Librium and methadone which, when taken together, increase the risk of death. Am. Compl. at ¶ 33. Plaintiff alleges this risk was exacerbated by Castelle's undiagnosed heart condition. Id. Taking Plaintiff's allegations as true, a concomitant prescription of Librium and methadone could create a condition that may produce death, and therefore, reading the Amended Complaint liberally, the Court concludes that P.A. Quentz's concomitant prescription of the two drugs, without any additional monitoring or testing, satisfies the objective prong of the test because Castelle developed symptoms warned of on the Librium label shortly before his death. See ECF No. 73, Ex. 1.

## 2. Mental Element of Deliberate Indifference

The Court next considers whether Plaintiff has sufficiently pleaded that P.A. Quentz "recklessly failed to act with reasonable care to mitigate the risk that the condition posed" to Castelle. Darnell, 849 F.3d at 35.

First, the Court concludes that Plaintiff has not satisfied the subjective prong as to P.A. Quentz's failure to perform an EKG. Plaintiff does not allege that P.A. Quentz was aware of Castelle's underlying condition or that P.A. Quentz should have known that Castelle had a heart

condition, and P.A. Quentz had no reason to know that failure to perform an EKG before issuing

the concomitant prescriptions Castelle would constitute a "substantial risk of serious harm." P.A.

Quentz's failure to conduct an EKG is more a "matter for medical judgment," Estelle v. Gamble,

429 U.S. 97, 107 (1976), rather than a reckless failure to act.

　　　　Second, the Court concludes that Plaintiff has established that P.A. Quentz's prescription

of Librium and methadone without additional monitoring satisfies the subjective prong of the

test. While "mere disagreement" regarding appropriate prescription treatment is insufficient to

establish deliberate indifference, Reyes v. Gardener, 93 F. App'x 283, 285 (2d Cir. 2004)

(quoting Chance v. Armstrong, 143 F.3d 698, 703 (2d Cir. 1998)), the Amended Complaint

establishes that, at a minimum, P.A. Quentz conducted no additional monitoring of Castelle

when the FDA warning label instructs medical practitioners to "follow patients closely for signs

and symptoms of respiratory depression and sedation." Am. Compl. at ¶ 34; see ECF No. 73-1 at

4. Therefore, as Plaintiff suggests, P.A. Quentz was "at least reckless" in prescribing the two

medications without monitoring because of the FDA's Librium warning label indicated that he

"knew, or should have known, that the condition posed an excessive risk to health or safety."

Darnell, 849 F.3d at 35; see ECF No. 68 at 6. It is not P.A. Quentz's prescription of the

medications in light of Castelle's then-unknown and undiagnosed heart condition that renders his

conduct "reckless." See Holmes v. City of New York, No. 17-cv-03874 (WHP), 2018 WL

4211311, at *7 (S.D.N.Y. Sept. 4, 2018) (dismissing medical indifference claims when the

plaintiff failed to plead whether the "medical provider had any basis to know that [he] had

previously suffered from a broken rib or that his condition might develop into anything more

serious at the time he visited the medical clinic"). Rather, it is P.A. Quentz's prescription of the

two medications, without follow-up or monitoring, given the information on the label, that

suggests to the Court that P.A. Quentz "knew or should have known" about the dangers of his course of conduct. Darnell, 849 F.3d at 35.

The Court thus concludes that Plaintiff has adequately pleaded that P.A. Quentz's actions are more than a "matter for medical judgment," Estelle, 429 U.S. at 107, or "negligence amounting to medical malpractice," Knight v. Koenigsmann, No. 18-cv-07172 (KMK), 2019 WL 2615977, at *10 (S.D.N.Y. June 26, 2019) (quoting Whitley v. Ort, No. 17-cv-03652 (KMK), 2018 WL 4684144, at *8 (S.D.N.Y. Sept. 28, 2018)). Standing alone, P.A. Quentz's decision to prescribe both medications is the type of "medical judgment that, without more, does not amount to deliberate indifference." Washington v. Westchester Cty. Dep't of Corr., No. 13-cv-05322 (KPF), 2014 WL 1778410, at *6 (S.D.N.Y. Apr. 25, 2014). But in light of the additional allegations in Plaintiff's Amended Complaint—namely, the known risks of P.A. Quentz's course of conduct—the actions here amount to more than a question of "medical judgment" and establish the second prong.

Plaintiff has sufficiently asserted more than a vague conclusion in order to survive a Rule 12(b)(6) motion to dismiss. Twombly, 550 U.S. at 555. I therefore recommend that the Court deny Defendants' motion to dismiss the claims against P.A. Quentz.

## III. Municipal Liability

In addition to her claims against individual correction and medical staff, Plaintiff also brings a claim against the City under Monell v. Department of Social Services, 436 U.S. 658 (1978). Am. Compl. at 14–21. Plaintiff argues that the City failed to "properly train, screen, supervise, or discipline" its employees and "failed to put adequate policies in place concerning the treatment of persons in custody." Id. at ¶¶ 84–85.

### A.  Establishing Municipal Liability

Monell provides that "a municipality can be held liable under Section 1983 if the deprivation of the plaintiff's rights under federal law is caused by a governmental custom, policy, or usage of the municipality." Jones v. Town of East Haven, 691 F.3d 72, 80 (2d Cir. 2012) (citing Monell, 436 U.S. at 690–91), cert. denied, 691 F.3d 72 (2013); see Connick v. Thompson, 563 U.S. 51, 61 (2011). This potential for liability applies to municipalities as well as "other local government units." Monell, 436 U.S. at 690.

To establish a municipality's liability under a section 1983 claim, "a plaintiff is required to plead and prove three elements: (1) an official policy or custom that (2) causes the plaintiff to be subjected to (3) a denial of a constitutional right." Wray v. City of New York, 490 F.3d 189, 195 (2d Cir. 2007) (quoting Batista v. Rodriguez, 702 F.2d 393, 397 (2d Cir. 1983)). There must be "a direct causal link between a municipal policy or custom and the alleged constitutional deprivation." City of Canton v. Harris, 489 U.S. 378, 385 (1989). Specifically, the municipality must have been the "moving force behind the alleged injury." Roe v. Waterbury, 542 F.3d 31, 34 (2d Cir. 2008) (internal quotation marks omitted). And that injury must consist of a constitutional violation. See Frith v. City of New York, 203 F. Supp. 3d 386, 391 (S.D.N.Y. 2016) (stating that if a plaintiff "has not established an underlying constitutional violation. . . there can be no municipal liability under Section 1983" (citing City of Los Angeles v. Heller, 475 U.S. 796, 799 (1986))).

Official municipal policy can be established by a government's lawmakers or by "practices so persistent and widespread as to practically have the force of law." Connick, 563 U.S. at 61 (citing Monell, 436 U.S. at 691). The policy may also "be pronounced or tacit and reflected in either action or inaction." Cash v. County of Erie, 654 F.3d 324, 334 (2d Cir. 2011);

see also Lucente v. County of Suffolk, 980 F.3d 284, 297 (2d Cir. 2020). Therefore, "[c]onsistent

with this principle, "where a policymaking official exhibits deliberate indifference to

constitutional deprivations caused by subordinates, such that the official's inaction constitutes a

deliberate choice, that acquiescence may be properly thought of as a city policy or custom that is

actionable under [section] 1983." Amnesty Am. v. Town of W. Hartford, 361 F.3d 113, 126 (2d

Cir. 2004) (Sotomayor, J.) (quotation and internal quotation marks omitted); see also Bd. of Cty.

Comm'rs v. Brown, 520 U.S. 397, 404 (1989) ("[A]n act performed pursuant to a 'custom' that

has not been formally approved by an appropriate decisionmaker may fairly subject a

municipality to liability on the theory that the relevant practice is so widespread as to have the

force of law." (citation omitted)).

Municipal liability can also be established through a municipal policymaker's failure to

appropriately train, supervise, discipline, or screen municipal employees "where such a failure

'amounts to deliberate indifference to the rights' of those with whom municipal employees will

come into contact.'" Santos v. City of New York, 847 F. Supp. 2d 573, 576 (S.D.N.Y. 2012)

(quoting Walker v. City of New York, 974 F.2d 293, 297 (2d Cir. 1992); see, e.g., Brown, 520

U.S. 397 (failure to screen); Amnesty Am., 361 F.3d 113 (failure to supervise); Walker, 974 F.2d

293 (failure to train); Batista, 702 F.3d 393 (failure to discipline).).

In the case of a failure to train, a court may draw the inference that a municipal policy

exists from "evidence that the municipality so failed to train its employees as to display a

deliberate indifference to the constitutional rights of those within its jurisdiction." Ricciuti v.

N.Y.C. Transit Auth., 941 F.2d 119, 123 (2d Cir. 1991) (citing Harris, 489 U.S. at 388–92). A

plaintiff alleging a municipality's failure to train or supervise has to establish: (1) "that a

policymaker knows to a moral certainty that her employees will confront a given situation"; (2)

"that the situation presents the employee with a difficult choice of the sort that training or supervision will make less difficult or that there is a history of employees mishandling the situation"; and (3) "that the wrong choice by the employee will frequently cause the deprivation of a citizen's constitutional rights." Walker, 974 F.2d at 297–98 (citations and internal quotation marks omitted). For a Monell claim to survive a motion to dismiss, a plaintiff cannot merely rely on "boilerplate statements"; a plaintiff "must allege facts tending to support, at least circumstantially, an inference that a municipal policy or custom exists." Matthews v. City of New York, No. 15-cv-02311 (ALC), 2016 WL 5793414, at *9 (S.D.N.Y. Sept. 30, 2016) (quoting Kucharczyk v. Westchester County, 95 F. Supp. 3d 529, 540 (S.D.N.Y. 2015)). When a plaintiff seeks to assert a failure to train theory, "a plaintiff must plausibly allege a specific deficiency in the municipality's training." Calderon v. City of New York, 138 F. Supp. 3d 593, 613 (S.D.N.Y. 2015) (quoting Tieman v. City of Newburgh, No. 13-cv-04178 (KMK), 2015 WL 1379652, at *22 (S.D.N.Y. Mar. 26, 2015)), reconsideration granted in part, 2015 WL 6143711 (S.D.N.Y. Oct. 19, 2015). Although a plaintiff cannot be expected to have and know the details of a municipality's training programs at the pleading stage, she is not relieved from her "obligation under Iqbal to plead a facially plausible claim." Id. (quoting Simms v. City of New York, 480 F. App'x 627, 631 n.4 (2d Cir. 2012)).

### B.  Plaintiff's Monell Claims

The Court understands Plaintiff to have asserted municipal liability under Monell through five theories: (1) that the City has a pattern and practice of denying adequate medical care to individuals incarcerated at the AMKC who present with serious medical issues, and  that the City's (2) failure to train, (3) failure to screen, (4) failure to supervise, and (5) failure to discipline correction officers who fail to provide medical care has caused the constitutional

violation here and created a culture of impunity. The Court concludes Plaintiff has pleaded

enough facts in her Amended Complaint for the Monell claim to survive the motion to dismiss.

### 1. Widespread pattern or practice

Plaintiff pleads the first part of her Monell claim by arguing that the City has a persistent

and widespread practice of denying adequate medical care to individuals incarcerated at AMKC.

Am. Compl. at ¶ 83. In such circumstances, the local government, "faced with a pattern of

misconduct and does nothing," has "compell[ed] the conclusion that the local government has

acquiesced in or tacitly authorized its subordinates' unlawful actions." Reynolds v. Giuliani, 506

F.3d 183, 192 (2d Cir. 2007) (citing Jett v. Dallas Indep. Sch. Dist., 491 U.S. 701, 737 (1989);

Green v. City of New York, 465 F.3d 65, 80 (2d Cir. 2006)). At this stage, however, a plaintiff

must merely allege facts that support the inference that the municipal custom exists. Matthews,

2016 WL 5793414, at *9 (quotation omitted).

As part of the threshold inquiry, the Court has determined that Plaintiff has established an

individual constitutional violation through C.O. DaCruz's failure to provide medical assistance

to Castelle. See Segal v. City of New York, 459 F.3d 207, 219 (2d Cir. 2006) (explaining that

Monell "extends liability to a municipal organization," and does not provide a separate cause of

action). Next, the Court considers whether Plaintiff has alleged facts sufficient to establish that

the City has acquiesced to the correction officers' practice of denying adequate medical care,

which "constitutes the 'standard operating procedure'" of the city. Jett, 491 U.S. at 737 (citing

Pembaur v. Cincinnati, 475 U.S. 469, 485–87 (1986) (White, J., concurring)). A plaintiff may

bolster her claim by providing "evidence that the municipality had notice of but repeatedly failed

to make any meaningful investigation" into allegations of constitutional violations, such as by

citing to similar incidents from other lawsuits or settlements. Ricciuti, 941 F.2d at 123; accord

Lucente, 980 F.3d at 307; see also Osterhoudt v. City of New York, No. 10-cv-03173 (RJD)(RML), 2012 WL 4481927, at *1 (E.D.N.Y. Sept. 27, 2012) (accepting the additional complaints of similar unconstitutional conduct cited by the plaintiff in order to establish, for motion to dismiss purposes, municipal liability).

Here, Plaintiff cites to numerous instances involving correction officers' denial of adequate medical care to other incarcerated individuals detained at the AMKC since 2013. See Am. Compl. at ¶¶ 76–81 (describing the deaths of Richard Gonzalez, Carlos Mercado, Bradley Ballard, Jerome Murdough, and Victor Woods at AMKC). These examples establish that C.O. DaCruz's denial of medical care to Castelle was not a "single incident of unconstitutional activity." City of Oklahoma City v. Tuttle, 471 U.S. 808, 823–24 (1985). The similar allegations in the five examples referenced by Plaintiff are bolstered by Plaintiff's (albeit general) description of the DOC's reporting system for correction officers, references to news articles about Rikers Island, and an investigation report about the use of force by correction officers and violence directed at adolescents detained on Rikers Island. See Am. Compl. at 14–20.

Plaintiff has sufficiently alleged facts "'tending to support, at least circumstantially,' the inference that the complained-of actions were pursuant to a municipal policy or custom leading to a rights violation." Kimble v. Kingston City Sch. Dist., 792 F. App'x 80, 82 (2d Cir. 2019) (quoting Montero v. City of Yonkers, 890 F.3d 386, 403–04 (2d Cir. 2018)). In light of the liberal standard applied at the motion to dismiss phase and the facts alleged in the Amended Complaint, I find that Plaintiff has "nudged [her] claims across the line from conceivable to plausible," Twombly, 550 U.S. at 570, and conclude Plaintiff has plausibly alleged a Monell violation on a theory of widespread practice.

### 2. Failure to Train

Plaintiff also bases her Monell claim on the City's alleged failure to properly train its employees on the assessment and treatment of individuals in custody. Am. Compl. at ¶ 85. A plaintiff that alleges a Monell claim premised on a failure to train "must allege that the failure to train constitutes 'deliberate indifference' on the part of the municipality." Lehal v. Cent. Falls Det. Facility Corp., No. 13-cv-03923 (DF), 2016 WL 7377238, at *7 (S.D.N.Y. Nov. 21, 2106) (quoting Cowan v. City of Mt. Vernon, 95 F. Supp. 3d 624, 638 (S.D.N.Y. 2015)).

Deliberate indifference requires "proof that a municipal actor disregarded a known or obvious consequence of his action." Connick, 563 U.S. at 62 (2011) (quoting Brown, 520 U.S. at 410). In other words, a successful Monell claim based on a failure to train theory must show that "the need to act [was] so obvious, and the inadequacy of current practices so likely to result in a deprivation of federal rights." Reynolds, 506 F.3d at 192; see also Connick, 563 U.S. at 62 ("Without notice that a course of training is deficient in a particular respect, decision makers can hardly be said to have deliberately chosen a training program that will cause violations of constitutional rights." (citation omitted)).

Applying the three-part test laid out in Walker, 974 F.2d at 297–98, Plaintiff must have sufficiently alleged that "defendants knew to a moral certainty that the City would confront a given situation; the situation presented the City with a difficult choice or there was a history of its mishandling the situation; and the wrong choice by the City would frequently cause the deprivation of [a] plaintiff['s] rights. See Reynolds, 506 F.3d at 192. Here, Plaintiff has plausibly alleged that the City knew that correction officers at Rikers would encounter situations in which they were asked and required to provide medical assistance to detained individuals. The history of incidents like Castelle's, as laid out in the Amended Complaint, are enough to establish not

only that the City could anticipate that its staff at the AMKC would encounter individuals who required medical assistance—especially given that the AMKC houses individuals undergoing drug detoxification and with greater medical needs, Am. Compl. at ¶¶ 26–27—but also that there is a history of "mishandling" such situations—with severe consequences. See Walker, 974 F.2 at 297; Am. Compl. at 15–21. Such a "pattern of similar constitutional violations by untrained employees is . . . necessary to demonstrate deliberate indifference for purposes of [a] failure to train" claim. Case v. City of New York, 233 F. Supp. 3d 372, 404 (S.D.N.Y. 2017) (quoting Connick, 563 U.S. at 62). Lastly, Plaintiff has also sufficiently alleged that the "wrong choice" causes a serious deprivation—in Castelle's case, his life.

The examples and cases referenced in the Amended Complaint "suggest that the conduct complained of is not limited to the four corners of [Plaintiff's] complaint." Id. at 406 (quoting Osterhoudt, 2012 WL 4481927, at *1). Although findings of liability have not been made in many of those cases and may not be enough to support Plaintiff's case at the summary judgment phase, "they do permit a plausible inference of deliberate indifference." Id. (quoting Osterhoudt, 2012 WL 4481927, at *2). Overall, Castelle's experience, combined with the other examples referenced in the Amended Complaint, sufficiently allege a history of problematic behavior such that the City was plausibly "on notice" of a training deficiency in correction officers' medical assessments and treatment of individuals at the AMKC. Cf. Santos, 847 F. Supp. 2d at 577 (dismissing failure to train claims because the complaint only alleged such a failure in "conclusory terms" and did not plead "any facts" to suggest there was a failure to train). At this stage in the litigation, that is enough. See Case, 288 F. Supp. 3d at 406 (recognizing the "'formidable hurdle' plaintiffs face at the pleading stage" (quoting Osterhoudt, 2012 WL 4481927, at *2)).

Plaintiff has also demonstrated a "direct causal link between [the] municipal policy" and the constitutional violation. Triano v. Town of Harrison, 895 F. Supp. 3d 526, 531 (S.D.N.Y. 2012) (quoting Harris, 489 U.S. at 385). Plaintiff alleges the City has failed to properly train correction officers on how to treat and assess the medical needs of individuals in custody. Am. Compl. at ¶ 85. This practice has a "direct causal link" with DaCruz's alleged indifference to Castelle's medical needs the morning he died.

I therefore find that Plaintiff has sufficiently set forth facts that establish a failure to train theory to support their Monell claim.

### 3. Failure to Screen

Municipal liability under Monell can also be established by a "failure to screen" an employee. See Brown, 520 U.S. at 410–11. To establish such a claim, "a plaintiff must plead facts to support an inference that the municipality's hiring of the individual reflected 'deliberate indifference to the risk that a violation of a particular constitutional or statutory right [would] follow the decision.'" Lehal, 2016 WL 7377238, at *8 (quoting Brown, 520 U.S. at 411).

Here, Plaintiff does no more than cursorily state a theory of liability based on the City's failure to screen correction officers and alleges no facts to support that theory. Without any facts to support an inference that the City failed to appropriately screen the correction officers it hired, Plaintiff's claim for municipal liability on the failure to screen must be dismissed. See Noonan v. City of New York, No. 14-cv-04084 (LTS)(JLC), 2015 WL 3948836, at *5 (S.D.N.Y. June 26, 2015).

### 4. Failure to Supervise

The failure to supervise its employees is another theory under which municipal liability can be established. See Reynolds, 506 F.3d at 192. As with the failure to train, a plaintiff must

plausibly allege that the "city's policymakers were 'knowingly and deliberately indifferent to the possibility that its'" employees were likely to commit constitutional violations. Amnesty Am., 361 F.3d at 127 (quoting Fiacco v. City of Rensselaer, 783 F.2d 319, 326 (2d Cir. 1986)). In the failure to supervise context, a plaintiff must establish deliberate indifference by demonstrating "that the need for more or better supervision . . . was obvious," but the defendant "made no meaningful attempt" to prevent the constitutional violation. Id. (quoting Vann v. City of New York, 72 F.3d 1040, 1049 (2d Cir. 1995)) (internal quotation marks omitted). A plaintiff can establish the failure to supervise by demonstrating "repeated complaints of civil rights violations," Vann, 72 F.3d at 1049, and that the municipality (1) "should have known their inadequate supervision was so likely to result in the alleged deprivations so as constitute deliberate indifference"; "(2) identify obvious and severe deficiencies in the . . . defendants' supervision that reflect a purposeful rather than negligent course of action; and (3) show a causal relationship between the failure to supervise and the alleged deprivations to" the plaintiff, Reynolds, 506 F.3d at 193; see Walker, 974 F.2d at 297–98.

Plaintiff's Amended Complaint plausibly establishes a failure to supervise. The history laid out in the Amended Complaint of correction officers' failure to provide medical care for individuals at the AMKC could be read to establish an obvious "need for more or better supervision," and "severe deficiencies" in correction officers' supervision given supervisory correction officers' awareness of such incidents through the "DOC's elaborate reporting system" and subsequent inaction. An v. City of New York, 16-cv-05381 (LGS), 2017 WL 2376576, at *3 (S.D.N.Y. June 1, 2017); Am. Compl. at ¶ 72; see also Vann, 72 F.3d at 1050 (reversing summary judgment against a plaintiff who established that the police department's "supervisory units paid virtually no attention to the filing" of civilian complaints against officers). Plaintiff has

also sufficiently pleaded that the failure to supervise was causally be related to Castelle's death. Therefore, I find that Plaintiff's failure to supervise claim survives defendants' motion to dismiss.

### 5. Failure to Discipline

Finally, Plaintiff asserts that the City is liable due to its failure to discipline correction officers who do not provide adequate medical attention to individuals at the AMKC. Am. Compl. at ¶ 85. "Municipal inaction such as the persistent failure to discipline subordinates who violate civil rights could give rise to an inference of an unlawful municipal policy of ratification of unconstitutional conduct" under <u>Monell</u>. <u>Batista</u>, 702 F.2d at397 (citing <u>Turpin v. Mailet</u>, 619 F.2d 196, 201, 202 (2d Cir.), <u>cert. denied</u>, 449 U.S. 1016, (1982)) (additional citations omitted). Accordingly, "'[a] municipality may be found to have a custom that causes a constitutional violation' if the city has been 'faced with a pattern of misconduct,' but 'does nothing, compelling the conclusion that [it] has acquiesced in or tacitly authorized its subordinates' unlawful actions.'" <u>Whitfield v. City of Newburgh</u>, No. 08-cv-08516 (RKE), 2015 WL 9275695, at *28 (S.D.N.Y. Dec. 17, 2015) (quoting <u>Okin v. Vill. of Cornwall-On-Hudson Police Dep't</u>, 577 F.3d 415, 439 (2d Cir. 2009)). While liability is most clearly established by a City's "persistent failure to discipline subordinates who violate civil rights," <u>Batista</u>, 702 F.2d at 397, liability may still lie with the municipality in circumstances where the City's "response to complaints" of the problematic conduct "was uninterested and superficial," <u>Fiacco</u>, 783 F.2d at 331; <u>accord</u> <u>Davis v. City of New York</u>, No. 12-cv-03297 (PGG), 2018 WL 10070540, at *5 (S.D.N.Y. Mar. 30, 2018).

Plaintiff's allegations adequately allege that the continued failure to discipline subordinates at the DOC who commit civil rights violations permits the "inference of an

unlawful municipal policy of ratification of unconstitutional conduct" under Monell. Sarus v. Rotundo, 831 F.2d 397, 400 (2d Cir. 1987) (quotation omitted). Plaintiff has sufficiently pleaded that through the pattern of correction officers' failure to provide medical attention to individuals at AMKC, see Am. Compl. at 17–20, thereby showing that the "local government is faced with a pattern of misconduct" and has done nothing, "compelling the conclusion that the local government has acquiesced in or tacitly authorized its subordinates' unlawful actions." Reynolds, 506 F.3d at 192 (citation omitted). Furthermore, Plaintiff has adequately alleged that the DOC's failure "to bring disciplinary charges against its officers," combined with the DOC's Investigation Division's failure to "adequately investigate allegations of misconduct" create a culture of impunity and "acquiescence" to this pattern of conduct. Am. Compl. at ¶¶ 73, 74; see Lucente, 980 F.3d at 306 (citing Turpin, 619 F.2d at 201–02); Selinger v. City of New York, No. 08-cv-02096 (RMB), 2009 WL 1883782, at *7 (S.D.N.Y. June 30, 2009) (upholding the plaintiff's failure to discipline claim given his allegations of New York City's failure to discipline police). I accordingly conclude that Plaintiff's Monell claim on a theory of failure to discipline withstands Defendants' motion to dismiss.

In sum, I recommend denying the Defendants' motion to dismiss Plaintiff's Monell claims on the basis of the widespread pattern and practice, and the City's failure to train, failure to supervise, and failure to discipline correction officers.

## IV.  Statute of Limitations

Defendants assert that Plaintiff's claims as to P.A. Quentz are time-barred as they were brought in the Amended Complaint after the statute of limitations had run. I find that Plaintiff's claims as to P.A. Quentz are not time-barred pursuant to N.Y. C.P.L.R. § 1024.

Because section 1983 does not provide a specific statute of limitations, courts apply the statute of limitations for personal injury actions under state law. Hogan v. Fischer, 738 F.3d 509, 517 (2d Cir. 2013) (citing Owens v. Okure, 488 U.S. 235, 249–51 (1989); Pearl v. City of Long Beach, 296 F.3d 76, 79 (2d Cir. 2002)). In New York, the statute of limitations for personal injury actions is three years. Vega v. Hempstead Union Free Sch. Dist., 801 F.3d 72, 79 (2d Cir. 2015) (citing Pearl, 296 F.3d at 69); see N.Y. C.P.L.R. § 214. The accrual date of a section 1983 cause of action, which is a question of federal law, starts "when the plaintiff knows or has reason to know of the harm." Connolly v. McCall, 254 F.3d 36, 41 (2d Cir. 2001) (quoting Eagleston v. Guido, 41 F.3d 865, 871 (2d Cir. 1994)).

### A.  Relation Back Under Rule 15(c)(1)

Amended complaints must meet the following requirements of Federal Rule of Civil Procedure 15(c)(1) to be considered as "relating back" to the date of the original complaint:

> (1) the claim must have arisen out of conduct set out in the original pleading; (2) the party to be brought in must have received such notice that it will not be prejudiced in maintaining its defense; (3) that party should have known that, *but for a mistake of identity*, the original action would have been brought against it; and . . . (4) the second and third criteria are fulfilled within [the period provided by Rule 4(m)], and . . . the original complaint [was] filed within the limitations period.

Hogan, 738 F.3d at 517 (quoting Barrow v. Wethersfield Police Dep't, 66 F.3d 466, 468–69 (2d Cir. 1995)) (emphasis in original) (second alteration in original); see Fed. R. Civ. P. 15(c)(1).

The failure to identify individual defendants (*i.e.*, the use of a "John Doe"), "when the plaintiff knows that such defendants must be named cannot be characterized as a mistake." Barrow, 66 F.3d at 470. That is, "'John Doe' pleadings cannot be used to circumvent statutes of limitations because replacing a 'John Doe' with a named party in effect constitutes a change in the party sued." Id. at 468 (quoting Aslanidis v. U.S. Lines, Inc., 7 F.3d 1067, 1075 (2d Cir.

1993); see also Ceara v. Deacon, 916 F.3d 208, 213–14 (2d Cir. 2019) (stating that, but for a misspelling of defendant's name, "it was clear from the first complaint to whom [plaintiff] was referring, and it was clear from the amended complaint that he was referring to the same individual," such that the "complaint was not a true 'John Doe' complaint subject to the no-relation back rule").

P.A. Quentz was not identified in Plaintiff's original complaint, which was filed on November 7, 2019. See ECF No. 1. Rather, Plaintiff asserted claims against a "Dr. John Doe" and did not assert any action attributed to P.A. Quentz. Id. The original complaint does not mention the EKG, but it does allege that someone prescribed Castelle Librium and methadone during the intake process. Id. at ¶ 30. This is sufficient to establish the first requirement—that the new claim arose out of conduct set forth in the original pleading. This may also satisfy the notice requirement, although, as Defendants note, the Amended Complaint inexplicably includes both Dr. John Doe #1 and P.A. Quentz.[5] In any event, Plaintiff cannot meet the third requirement of Rule 15(c)(1)(C). Plaintiff's failure to identify P.A. Quentz in the original complaint "cannot be characterized as a mistake," as the Amended Complaint did not simply "sub in" P.A. Quentz for "Dr. John Doe #1," but sought "to add information" that Plaintiff did not have when she filed the original complaint. Scott v. Village of Spring Valley, 577 F. App'x 81, 82–83 (2d Cir. 2014);

---

[5] It is unclear whether Plaintiff intended to substitute Dr. John Doe #1 with P.A. Quentz or whether P.A. Quentz is a new party and the reference to Dr. John Doe #1 has been left in the Amended Complaint intentionally. See Am. Compl. at ¶ 22. Dr. John Doe #1 is not included in the caption of the Amended Complaint but he is included in the body. See id. "While Rule 10(a) of the Federal Rules of Civil Procedure requires that the caption of a pleading name all the parties to a lawsuit, the caption itself is normally not determinative of the identity of the parties or of the pleader's statement of claim." JCG v. Ercole, No. 11-cv-06844 (CM)(JLC), 2014 WL 1630815, at *16–17 (S.D.N.Y. Apr. 24, 2014) (internal quotation marks and citation omitted) (finding that because Plaintiff did not allege sufficient facts in the body of the complaint to establish that a correction officer—not included in the caption—was an intended defendant, he should not be considered as one), report and recommendation adopted, 2014 WL 2769120 (June 18, 2014).

Barrow, 66 F.3d at 470. Therefore, Plaintiff's claims as to P.A. Quentz are time-barred under Fed. R. Civ. P. 15(c)(1)(C).

### B.  Relation Back under New York State Rules

When a plaintiff cannot meet the requirements of Rule 15(c)(1)(C), under Rule 15(c)(1)(A) her amended pleading may still relate back when "the law that provides the applicable statute of limitations allows relation back." Fed. R. Civ. P. 15(c)(1)(A); Hogan, 738 F.3d at 518. The Court will therefore consider the relation-back of P.A. Quentz's claims under N.Y. C.P.L.R. § 203 and N.Y. C.P.L.R. § 1024.

### 1.  N.Y. C.P.L.R. § 203

New York's relation-back rule, C.P.L.R. § 203, allows amendments to relate back to a timely-filed pleading when:

> (1) the new claim arose out of the same conduct, transaction or occurrence as the original allegations; (2) the new party is united in interest with the original defendant, and by reason of that relationship can be charged with such notice of the institution of the action that he will not be prejudiced in maintaining his defense on the merits; and (3) the new party knew or should have known that, but for a mistake as to the identity of the proper parties, the action would have been brought against him as well.

JCG, 2014 WL 1630815, at *15 (citing Fisher v. County of Nassau, No. 10-cv-00677 (JS)(ETB), 2011 WL 4899920, at *5 (E.D.N.Y. Oct. 13, 2011)); see N.Y. C.P.L.R. § 203(c). Under the second requirement, a city and its employees can "have a practical unity of interest," even though, in a section 1983 claim, "a municipality cannot be held liable *solely* because it employs a tortfeasor." DaCosta v. City of New York, 296 F. Supp. 3d 569, 586 (E.D.N.Y. 2017) (quoting Monell, 436 U.S. at 691) (emphasis in original).

Under N.Y. C.P.L.R. § 203, Plaintiff's claims against P.A. Quentz are also time-barred. As already discussed, the new claim arose out of the same occurrence as the original allegations.

The City and P.A Quentz may have a practical unity of interest that would satisfy the second prong. See DaCosta, 296 F. Supp. 3d at 586 ("New York City has a statutory obligation to indemnify individual [employees] for their tortious conduct so long as the tortious conduct" occurred within the scope of their employment and did not violate "'any rule or regulation of his agency at the time the alleged act or omission occurred'") (quoting N.Y. Gen. Mun. Law § 50–k(2)). But the claim fails to meet the third prong as it fails to meet the third requirement of Rule 15(c)(1)(C) as there was no mistake in the identity of the proper parties. See Vasconcellos, 2014 WL 4961441, at *6–8.

### 2.  N.Y. C.P.L.R. § 1024.

The other relation-back statute under which Plaintiff might avail herself is N.Y. C.P.L.R. § 1024, which applies specifically to John Doe defendants. Under C.P.L.R. § 1024,

> A party who is ignorant, in whole or in part, of the name or identity of a person who may properly be made a party, may proceed against such person as an unknown party by designating so much of his name and identity as is known. If the name or remainder of the name becomes known all subsequent proceedings shall be taken under the true name and all prior proceedings shall be deemed amended accordingly.

See Hogan, 738 F.3d at 518. For C.P.L.R. § 1024 to apply, a party must: (1) "exercise due diligence, prior to the running of the statute of limitations, to identify the defendant by name," and (2) "describe the John Doe party 'in such form as will fairly apprise the party that [he] is the intended defendant.'" See id. at 519 (quoting Bumpus v. N.Y.C. Transit Auth., 883 N.Y.S.2d 99, 104 (2d Dep't 2009)) (alteration in original).

"Due diligence is not exercised by 'last minute' or token discovery requests" but can be demonstrated in various ways. Barrett v. City of Newburgh, 720 F. App'x 29, 33 (2d Cir. 2017) (citations omitted); see, e.g., Hogan, 738 F.3d at 519 (due diligence was established on the basis

of discovery requests); Joseph v. Bute, No. 16-cv-02004 (PKC)(LB), 2019 WL 181302, at *5 (E.D.N.Y. Jan. 9, 2019) (plaintiff filed a formal Civilian Complaint Review Board complaint, subpoenaed counsel, and submitted a request under state or federal Freedom of Information laws); but see Barrett, 720 F. App'x at 33 (plaintiff filed "formal discovery demands" one year after the case against the city was dismissed); Vasconcellos, 2014 WL 4961441, at *9 (plaintiff's counsel sought letters of administration for plaintiff's son, but "did not file a Valentin demand or take any other steps to identify the Officer Defendants until after the initial conference" when the statute of limitations had run).

Plaintiff argues that she meets the first requirement of N.Y. C.P.L.R. § 1024; namely, that she exercised due diligence to identify P.A. Quentz before the statute of limitations ran. See ECF No. 68 at 22–23. The Court agrees. The Declaration of Rob Rickner, Plaintiff's counsel, and accompanying exhibits demonstrate that Castelle's parents spent years investigating their son's death right after his death. See ECF No. 69 & Exs. 1–12. Castelle's father's attorney sent a broad Freedom of Information Law request to the DOC less than a week after Castelle died. ECF No. 69 at ¶ 2; ECF No. 69, Ex. 1. Plaintiff's prior counsel requested all autopsy reports and medical records from the New York City Chief Medical Examiner on December 8, 2016, and subsequently filed an Order to Show Cause in New York Supreme Court, County of Richmond, for the Chief Medical Examiner's records, although those records ultimately did not include the Rikers Island records that identified P.A. Quentz. ECF No. 69 at ¶¶ 3–5. ECF No. 69, Exs. 2 & 3. Plaintiff brought suit in New York state court against the City and the DOC on May 5, 2017, ECF No. 69, Ex. 4, but the case was dismissed before the City responded to Plaintiff's discovery demands, ECF No. 69 at ¶¶ 6, 19. See ECF No. 69, Ex. 5. After the state court dismissed the case, Plaintiff retained present counsel and filed the original complaint on November 7, 2019.

ECF No. 69 at ¶ 20. Once Plaintiff served the original complaint, defense counsel agreed to provide medical records and to allow an amended complaint, and Plaintiff received the records identifying P.A. Quentz on February 13, 2020. Id. at ¶¶ 21–23; ECF No. 69, Ex. 12.

The City disputes Plaintiff's version of events, suggesting that Plaintiff could have received Castelle's medical records after Plaintiff provided the defendant in the state court action with a completed HIPAA authorization form on January 2, 2018. See ECF No. 73 at 9. Nevertheless, Plaintiff appears to have exercised due diligence to identify P.A. Quentz's alleged role in Castelle's death before the limitations period expired. Plaintiff did not engage in "last minute" or "token discovery requests" because she began litigating this case and she did not wait until the state court dismissed her prior case before requesting Castelle's medical records in various ways. See Barrett, 720 F. App'x at 33. Moreover, Plaintiff did not unduly delay filing her Amended Complaint on March 9, 2020, after receiving the records that identified P.A. Quentz on February 13, 2020.

As to the second component of N.Y. C.P.L.R. § 1024, I find that the original complaint fairly apprised P.A. Quentz that he was the intended defendant. See Joseph, 2019 WL 181302, at *5 (asserting that the original complaint filed by the living plaintiff "fairly apprised" the officers that they were the intended defendants because it "specified the date and place of the relevant events, the conduct engaged in by the officers, and even described the involved officers"); Hogan, 738 F.3d at 519 (holding that pro se plaintiff's original complaint "provide[d] enough detail to give notice to the John Does that they were the intended defendants" because it "describe[d] with particularity the date, time, and location of the" incident and included "substantial detail concerning the appearance of his alleged assailants"). Although the original Complaint named a medical doctor rather than a physician's assistant, it specified the date and

place: November 2, 2016, at the AMKC; and the conduct attributed to the medical professional: prescribing Librium and methadone to Castelle. ECF No. 1 at ¶¶ 30–31.

For these reasons, I find that, notwithstanding Rule 15(c)(1)(C) and N.Y. C.P.L.R. § 203, Plaintiff's claims against PA Quentz are not time-barred under N.Y. C.P.L.R. § 1024 as allowed by Rule 15(c)(1)(A).

## CONCLUSION

I recommend that the Court GRANT the motion and dismiss the claims against Correction Officers Ward, Brown, Sistrunck, Daniels, Nugent, and Azeez; GRANT the motion and dismiss the claims against Captains Batchelor, Price, and Ellis; DENY the motion against Correction Officer DaCruz; and DENY the motion against P.A. Quentz. I also recommend the Court DENY the motion to dismiss the <u>Monell</u> claims against the City. I find that the claims against P.A. Quentz are not time-barred.

SARAH NETBURN
United States Magistrate Judge

DATED:      January 25, 2021
            New York, New York

\*                    \*                    \*

## NOTICE OF PROCEDURE FOR FILING OBJECTIONS TO THIS
## REPORT AND RECOMMENDATION

The parties shall have fourteen days from the service of this Report and Recommendation to file written objections pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure. <u>See also</u> Fed. R. Civ. P. 6(a), (d) (adding three additional days when service is made under Fed. R. Civ. P. 5(b)(2)(C), (D) or (F)). A party may respond to another party's objections within fourteen days after being served with a copy. Fed. R. Civ. P. 72(b)(2). Such

objections shall be filed with the Clerk of the Court, with courtesy copies delivered to the chambers of the Honorable Lewis A. Kaplan at the United States Courthouse, 500 Pearl Street, New York, New York 10007, and to any opposing parties. See 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(d), 72(b). Any requests for an extension of time for filing objections must be addressed to Judge Kaplan. The failure to file these timely objections will result in a waiver of those objections for purposes of appeal. See 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(d), 72(b); Thomas v. Arn, 474 U.S. 140 (1985).